Good morning, Your Honor. You may appease the court. Michael Ward, on behalf of Cornelia Cornejo, raised three issues in this appeal. The Attorney General responded to them and suggested a remand for consideration of the third. I will address that last. Counsel, you're going to need to speak a little louder or closer to the microphone. I'm having difficulty hearing you. Is this any better? Yes, thank you. I would also like to reserve three minutes for rebuttal. I mentioned that the Attorney General only addressed two of the three issues we raised and asked for a remand on the third, which I will discuss after the first two. The first issue concerns the judge's adverse credibility finding, which the board endorsed. Counsel, may I ask you a question about that issue? Your client testified that she and her mother left their home in September of 2017 and went to live with a niece, and then the mom went to live with the petitioner's brother. But the mom and the brother, their declarations say that she stayed in her home until the end of January 2018, and I believe they don't even mention the niece. And your client gave an explanation, but why was that inconsistency something that had to be overlooked in terms of credibility? Your Honor, the mother's letter did not state that she was living at the house. It really said that on that day she was at the house. And it did not state that she went to live at that point with her son, with his brother. Rather, it stated she retired to his house. That's a different thing than living somewhere. I can retire. Let me stop you on that, because the brother's declaration talks about specific dates in January, and he says on the 28th his mother told him about a death threat, which caused him on the 29th on Sunday to go pick her up. Now, that doesn't suggest to me that she's already living at the brother's house. It suggests to me that he has to go pick her up a day after she tells him about death threats. Your Honor, just as easily isn't going to do it. Because the question for us is whether the evidence compels the result that you're advocating. And to tell me just as easily doesn't tell me why the IJ was compelled to accept your client's version. Because the brother's letter did not suggest that he was going to bring her back to his place. I'm sorry, it did not suggest that he was living at the other place. It only suggested that at this time he was at the house, he ran into trouble, and he called in and went into gossip the next day. The problem is that I think, as Judge Clifton is pointing out, the problem for your client in this case is the standard of review. It is a very stringent, substantial evidence standard. We have to be compelled to find contrary to what the agency found. And what you say is a possible interpretation, but I have difficulty seeing that it's the only reasonable interpretation of the record. And in the absence of that, I don't understand how we can overturn the adverse credibility finding. Your Honor, I don't understand. Counsel, we cannot hear you. Could you please get close to the mic? The mic is in the computer and therefore I'm seeing my face. That's fine. The letters do not say what the judge inferred from them. It's one thing to have a possible interpretation. It's another thing where the letter does not say that he was living in that house. It does not say that her son went to bring her up while she was living in his house. All it says is, I was at the house. Well, let me push further on those letters because neither of them say anything about the mother leaving with your client in September. Indeed, the mother's declaration, first reference is to how presumably the gangs have seized homes and plots of land, including her property and that of her daughter, since the end of November, suggesting that there wasn't need to flee until November. There's no mention of anything in September. And she's back in January. And how does that really coincide with the story told by your client? Your Honor, I don't believe that not saying anything in her declaration is contradicting what my client said. But it sure sounds like from the mother's description, she's back there in November and that's what may have caused her to lose the property. The gangs start seizing it at the end of November. That just doesn't seem consistent. Your Honor, there's nothing in the letter that suggests that she was staying there. The gang went over the territory and bailed the house and decided that she needed to get out of there. That doesn't say she was living there. Could I just ask you, if we disagree with you and we feel that we're not compelled to overturn the IJA's adverse credibility determination, is there anything in the record that supports your client's position? Anything in the documents other than her testimony? My client's position on the need for a trial of her fear of persecution, which is all based on her testimony. Okay, thank you. Again, I do not believe that the language in the letters contradicts my client. She said that she did not learn anything from her mother after she left. She did not know exactly what her mother was doing. And all she said was that we, she and her mother, never went back to New York. So I do not see where the contradiction arises in the letters and the testimony. Well, the question is whether the inferences that the IJA drew were reasonable, because if they were, the findings themselves are reasonable. Your Honor, they're only reasonable if there are facts that support them. And the language in the letter does not support them. If you actually look at the language in the letter, carefully, it says nothing that supports her judgment. As I said, she said she was tired of her son's death. That doesn't mean I want to remove his behavior. On the second issue, it's whether she was able to go to 400 trials, one hearing every week in the course of nine years. The judge's conclusion that that was not possible is pure speculation. We have absolutely no basis whatsoever for that. Counsel, I have a question for you about that. I tend, just speaking for myself, to agree with you that that was unreasonable speculation. But if there is one valid basis for an adverse credibility finding, is that not sufficient? I know you don't concede that there is one, but if there is one, is it enough? Your Honor, I know that credibility questions no longer have to go to the heart of the matter. But on the other hand, if it does not really issue the question of facts, not really relate to the claim. Counsel, that's not my question. That's not my question. If there is one valid basis for an adverse credibility finding and the others are not supported, don't we still uphold the finding? Your Honor, my effort to answer was that yes, in some cases, but if it's not on a matter that really makes a difference, that you can find that it's not sufficiently relevant in the case. Well, it seems to me that the question of whether your client fled from the gangs is completely relevant. And the timing of that seems important as well to support or not support her claim about the threats that she received and when she received them. So I don't understand how it's tangential. Your Honor, the timing of early departing is a separate question from whether her mother went back there to leave. She may have departed and both have departed and her mother went back. That does not affect her fear of the gangs for being forced to leave because of her fear of the gangs. And I believe for that reason, you could find that this is tangential. It would require you to get more of a testimony. On the final issue, I see I'm running out of time, which is the ability of the government of El Salvador to protect my client. I don't think this is a question of country conditions, although I noted in the brief that none of the country conditions were inspired by the judge or the Attorney General. It deals with the ability of the government as opposed to its willingness to protect me. In fact, the obvious facts are that they couldn't. He asked for a transfer. And after that, they headed out and found her, got her dogs, left a grenade on her doorstep. So this is not. Counselor, you're down to less than two and a half minutes. Did you wish to save that as rebuttal time? I will. Thank you, sir. We'll hear next from the government. Mr. Ward, if you'll mute your microphone now and we'll hear from the government. Good morning. May it please the court. My name is Margo Niffin for the United States Attorney General. The agency properly denied Ms. Cornejo's applications for asylum and withholding of removal based on two dispositive bases. That she failed to provide credible testimony and, in the alternative, that she did not establish that the government of El Salvador was unable or unwilling to protect her. Ms. Cornejo fails to compel the reversal of either of these dispositive determinations. Counsel, assuming we agree with the first one, do we have to reach the second? No. The credibility finding is dispositive of Ms. Cornejo's claim. So in finding Ms. Cornejo not credible, the agency properly relied on specific instances in the record as required under STRESA. First, as the agency found, Ms. Cornejo's testimony regarding the final threats that she received in El Salvador and her fleeing from her home in September 2017 was inconsistent with the declarations in the record. Ms. Cornejo stated that after receiving three threats in August and September 2017, she and her mother fled their home, moved in with her niece for a month and a half, and then she fled to the United States and her mother moved in with her son. She then stated on page 720 of the record that neither she or her mother had since returned to the home. The declarations, on the other hand, indicate that her mother, in fact, remained in the home until January 2018. When asked to explain this inconsistency, Ms. Cornejo speculated that her mother could have returned to the home to check on it. However, the record does not compel the finding that this speculation resolves the inconsistency. Looking at the declarations as discussed, the declarations indicate that her mother was at the home at least several times in November 2017 and that, according to her brother, she received a threat on January 28, 2018, and that he came to pick her up the following day on January 29. And so the declarations show that she was in the house several times and at least living in the house in January 2018. Let me start with the first part. What says she was there several times in November? If we look at the language of the declaration, so this is on page 76, oh, excuse me, on her mother's declaration on page 768 of the record. She says on several occasions she has found these people just meters from her home resting and heavily armed. So we know and this was this in November 2017 on several occasions. And so I don't I don't see it that way. I don't think any there's any particular time period linked to that statement. Proceeding sentence makes reference to the gang seizing homes and plots of land since the end of November. It seems to me it's more open ended than that. November, December, January. Finally, we have dates at the end of January. But it doesn't it doesn't say to me that she was necessarily there several times in November. No, that does that does excuse me that. So we know that this was during the period that in the fall after Miss Cornejo, importantly, says that they fled the home in September. And so she says that during this period, she saw these gang gang members on several occasions around her home. So we know that she was at her home at least several times. And then she says that that necessarily inconsistent with not living there, but going back from time to time to check on things. Well, I think that two points, I think that importantly, she says that on January 28th, 2018, she received this threat. And it was this threat that forced her to retire to her son's house. The declaration does not say anything about her leaving the home in September, moving to her niece's house or moving to her son's house in at the end of October, as Miss Cornejo claimed. In addition, according to Miss Cornejo's brother's declaration, which is on page 771 of the record, he indicates that his mother received a threat on January 28th. And it was because of this threat that the following day, on January 29th, that he picked her up and brought her to stay with him. And so we know that she was at least living at the home in January, in January 2018. And we're now looking under the standard of review that the record has to compel the finding that Miss Cornejo's speculation resolves this inconsistency. Given the record, given the declaration's indication that she was at the home at least several times, she was living at the home on at least one occasion in January, in January 2018. It does not compel the finding that she just went home to check, she went back to the home to check on it, as Miss Cornejo indicated. I have a question about your alternative suggestion from the beginning of your argument. Again, speaking just for myself, I have some difficulty with a finding that the government was able to protect the petitioner in her hometown. So what is your best pitch that is a permissible finding? So as Miss Cornejo testified, the government took many different steps to protect her while she was a police officer. As the record shows, her supervisor... That shows counsel, that shows willingness. I'm not questioning willingness, but it's unable is another option. And so I want to have you address unable. So looking at the country condition evidence in the record, we have mixed evidence regarding showing both the continued challenges that El Salvador faces in addressing gang violence, and in addition, the success that the government has had in protecting police officers and the general public from gang violence. I would point the court's attention to page 367 and 368 of the record. This article shows that the government of El Salvador has invested heavily with the support of the United States. The State Department has invested $48 million in addressing these issues. The FBI has trained 855 police officers, and with this assistance, and this is according to the State Department, the Salvadorian government, with the United States government support, has made significant gains in the area of security, including reduction in homicides and every other category of violent crime measure. Well, what's the headline of the article you're citing to? And if you read the headline, it doesn't build a lot of confidence. Yes, but there is still this mixed evidence, and under as... The headline you point to to support the proposition that the government is able to protect officers is an article from the Washington Post headlined, It's so dangerous to police MS-13 in El Salvador that officers are fleeing the country. I can't say that builds a lot of support for the proposition that the government is able to protect those police officers that are fleeing the country. Well, under the standard of unable or unwilling, it's not. This court has never adopted a standard requiring that the government protect every individual. Instead, it refers to serious problems with the justice system, and I think if we look at cases where this court has found an inability to protect, for instance, in a freeway, in that case, the police station had one gun shared by the entire police station. And so that's, I think, that we have to look. It's always been seen as a spectrum. And here, again, we have multiple instances in Ms. Cornejo's own experience as a police officer showing these efforts. Yes, and we also have a lot of evidence that those efforts were unsuccessful with respect to her. She continued to get threats, and nothing seemed to work, to be frank. And it wasn't until she finally reported the gang's threats. She didn't report the gang's threats until September 2017. At that point, the police did take her report and assigned her a code name to protect her identity, and she testified that she had no idea whether they investigated because she fled soon thereafter. And again, that's why the agency looked to these mixed country reports in the record. And as Judge Van Dyke recently discussed in the concurrence of the last guest thus far, when we have mixed country reports, the court cannot substitute the agency's judgment for its own. Here, the agency properly weighed Ms. Cornejo's own experience with this mixed evidence in the record. We have evidence, in addition to this article, we have evidence that El Salvador is prosecuting gang members who are targeting police officers. Right, we also have evidence that, excuse me, there's evidence that the reason they're being prosecuted is that they're killing officers at a fairly high clip. Dozens of officers is what the record shows, and prison guards and others in law enforcement are being killed in large numbers. That doesn't strike me that the government is able to protect people in that category. And again, the agency recognized that. The agency recognized that this is an ongoing challenge. However, the agency also recognized that in recent years, due to this investment and to these efforts that have been made, we are seeing a reduction in violent crime and in the homicide rate. The article goes on to say that between 2017 and 2018, there was a 10% reduction in homicides. And so the evidence shows, shows police officers. Excuse me. Is that generic? It's in the, in generic, in the homicide rate in El Salvador. That seems unhelpful. That seems entirely unhelpful. I mean, if the rest of the homicide rate dropped to zero and, you know, dozens of police officers are still killed. I don't see how that really even is relevant. I was wondering about the particularized racial group. She described it as current police officers. And I think there's a question about being a current police officer is not a immutable characteristic. The opposing counsel said, well, former police officers may also be persecuted. But I wasn't sure I saw that directly. Could you, could you discuss that? Can you repeat the question? I apologize. Yes. So my question is, how do we analyze her particularized racial group, which is for his current police officers, which the agency said is not an immutable characteristic? Of course. So she, she, Ms. Cornejo defined her social group based on current police officers because she indicated that she did not, did not resign from the police force. The government, the agency, excuse me, found that that was not immutable under Ayala because the status of being a police officer is not an immutable quality. The government, however, is not defending that aspect of the agency's decision because under a matter of a B, the agency has to look at the entire social group. And here the agency did not do that. It only looked at the aspect relating to her status as a police officer. However, as we indicated in briefing, the court need not reach the issue because the agency's adverse credibility finding and unable or unwilling finding are both independently dispositive of Ms. Cornejo's claim. I have to say, I really didn't understand the position you took in briefing with regard to a particular social group. At the very end of your brief, there's a footnote that says, well, this would have to be remanded to the agency. And the petitioner made an argument on that. And you elected not to respond. So I don't understand why, why the government has the option, well, we won't respond, we'll make them send it back to do it over again. When in fact, the petitioner's already made an argument. You could have and should have responded to and didn't. So why is it the agency gets an extra bite? Well, because the other bases are dispositive. Yeah, you win on the other bases. I accept that. But if you don't win on the other bases and we reach the issue of particular social group, why is it that you didn't respond to that? Why is it you say, well, the agency should take another whack at it? They had their chance. You had your chance. You didn't say anything about particular social group. Because the question of social distinction and particularity are inherently fact-based questions. And the agency ruled on it. And petitioner made an argument to us. And you elected not to respond. So why do we remand? Because the agency would need to grapple in the first instance with those fact-based questions regarding social distinction. But counsel, the problem is, I think that Judge Clifton is pointing out, is the agency did grapple with it. They got it wrong, let's just say. I mean, it sounds like you concede that they got it wrong by your footnote and by not responding on the merits. So if they've already grappled and got it wrong, I don't understand why there would be a remand either. Well, again, the court need not reach those issues, given the other dispositive bases for denying the petition. Thank you, counsel. I think we understand your position. And you have exceeded your time. Thank you. Thank you, counsel. And Mr. Ward, you have some rebuttal time remaining. And please come close to the microphone for us. Thank you. I'd like to just correct, start by correcting the math. Ms. Branko did not say that neither she nor her mother went back to the community. She said we did not go back to the community. That doesn't mean that her mother did not do it alone. And she didn't claim to have knowledge whatsoever about what her mother did. Second, I didn't report her problems once. I reported them at least three times. She talked to her boss and his team based in Wisconsin. Now, be careful. There's nothing I can do about it. They reported it again, and they transferred her to a different department. Could you speak closer to the microphone again? You're fading. The second time she reported, she asked for a transfer to a different department, which they granted, which did no good. We still had our dogs killed and a bomb placed and a gun pointed at our head as a death threat. Lastly, on the particular social group, one matter that the attorney general doesn't point out, one of her social groups specifically specified those that had testified against officers or against gang members. That's an immutable characteristic. Neither the board mentioned that nor the attorney general mentioned that. An immutable characteristic. Was that part of her proposed social group? That was mentioned. The briefing just says it's honest Alvadoran police officers who participated in anti-exploitation activities. And uncorrect is Alvadoran police officers who testify against gang members. It's the second one that talks about testifying against gang members, which is an immutable characteristic. I would only just ask the court in my four seconds to recall that this was an amnesty case, in which case the question is what there is a reasonable possibility of, even in examining the ability of the government to protect Ms. Cornetto. And I'm over my time, so thank you. Thank you, counsel. The case just argued is submitted and we appreciate very much the arguments from both of you. Thank you.
judges: Graber, Clifton, Ikuta